## LINCOLN IRONWORKS et al. v. W. H. McWHIRTER CO.

(Circuit Court, E. D. New York. July 29, 1904.)

1. PATENTS—SUIT FOR INFRINGEMENT—PARTIES.

In a suit against a patentee, it was adjudged that, by virtue of an agreement made before the application was filed, plaintiff was entitled to a half interest in the invention; and it was decreed that the patentee should convey to him "the equal undivided one-half of whatever interest he may have acquired" to the invention, and a conveyance was accordingly made in the terms of the decree. At the time the patentee held the title to a one-half interest only in the patent, having assigned the other half interest. *Held*, that the conveyance carried his entire interest, and divested him of all title, so that he was not a necessary party to a subsequent suit for infringement.

2. SAME—ANTICIPATION—STONE PLANING MACHINE.

The Gilmour patent, No. 575,154, for a stone planing machine, having two tables or platens, which may be operated separately, or locked together and operated as one, was anticipated as to the general idea, which was conceived by another, from whom the patentee obtained it, and who afterward embodied it in concrete form; and the patent is valid only as to the specific means for locking the two platens together, shown in claim 3. Such claim *held* not infringed.

In Equity. Suit for infringement of letters patent No. 575,154, for a stone planing machine, granted to Joseph Gilmour January 12, 1897. On final hearing.

David J. Newland (Harry E. Knight and W. H. Deady, of counsel), for complainants.

Walter C. Flanders (E. B. Stocking, of counsel), for defendant.

THOMAS, District Judge. The bill was filed to enjoin the defendant from infringing letters patent No. 575,154, granted January 12, 1897, to Joseph Gilmour, pursuant to application filed February 20, 1896. On April 2, 1900, Gilmour assigned his whole interest to the Lincoln Ironworks, one of the complainants. On June 27, 1901, the Lincoln Ironworks assigned to Gilmour an "undivided one-half of the right, title, and interest." On April 20, 1900, it was found by Mr. Justice Dickey, in a suit in the Supreme Court of the state of New York, wherein William R. Young was plaintiff and Joseph Gilmour was defendant, that on the 20th day of February, 1896, the plaintiff, William R. Young, and the defendant, Joseph Gilmour, entered into a partnership for the purpose of devising and inventing a double platen planer, and that Gilmour promised to assign to Young one-half interest in the invention, or any patent obtained therefor, and it was decreed that Gilmour should execute such assignment in a prescribed form. On July 10, 1901, Gilmour executed and delivered such assignment to Young, in the form directed. At the time of such assignment, the Lincoln Ironworks and Gilmour each had legal title to an undivided one-half interest in the letters patent. At least, Gilmour's holding was subject to the equitable title of Young, and when he conveyed to Young "the equal undivided one-half of whatever interest" he "may have acquired to any invention," etc., he fulfilled the commands of the decree, and thereby retained no inter-

est. He was directed to transfer, not one-half of what interest he technically held at that time, but one-half of what "he may have acquired." His actual, technical holding chanced to be coincident with the interest that Young was entitled to receive. Hence Gilmour retained nothing. Upon a motion to bring Gilmour in as a party, he disclaimed all interest, and the court declined to make him a party; reserving to the complainant the right to renew the application "if it shall be made to appear to the court that said Gilmour has any interest." It is concluded that the complainants hold the whole title to the letters patent.

The defendant objects that Young, and not Gilmour, was the inventor, or that they were joint inventors. Gilmour and Young, before the application for the patent was filed, agreed that Gilmour was the inventor, after consultation with their attorney, and thereupon the patent was taken in Gilmour's name. Young is a party to this suit, and he and the Lincoln Ironworks, also a complainant, have the whole title. Hence the defendant is not imperiled, so far as either Gilmour or Young is concerned, in any decree that may be made herein. The only question is whether the statute is fulfilled.

In the suit between Young and Gilmour, the former testified:

"I invented it. I got the idea. I took a piece of paper, I put it on my drawing board, and I began to draw out the planer, and then I began to study out how two beds could be put together and worked singly individually or together. Q. Where did you get the idea? A. From Joseph Gilmour. He said he got it from another party. Q. You developed the idea that he gave you? A. I did. Q. And you made— What did you do? A. I made the drawings, so that the patent drawing could be made from my drawings."

But the evidence in the state court was of such a nature that Young was constrained to amend his complaint as follows:

"(1) That on or about the 20th day of February, 1896, plaintiff and defendant entered into an agreement of copartnership, whereby they agreed to devote their time and energies toward devising and inventing a machine for finishing and cutting stone, to be known as the 'double platen planing machine.'

"(2) That such double platen planing machine was invented, and letters patent for said machine were issued by the United States to Joseph Gilmour, defendant, in pursuance of the agreement entered into between plaintiff and defendant, in consideration whereof defendant promised and agreed to assign to the plaintiff an undivided one-half interest in said patent, and further agreed to pay to plaintiff one-half of the profits arising from the sale of said machine." .

And the finding and judgment proceeded as above given. This did not establish that Young was an inventor or joint inventor, but that he was a copartner, entitled to share equally in the results. Upon the trial of the suit at bar, Young testified:

"I do not exactly recollect all the particulars of the machine. At this time I am of the belief that he suggested keys or other fasteners. It was certainly understood at the time that it was necessary to fasten the two platens together when working as a unit or a whole, and there is no doubt he informed me how to do it at the time. I would state that at that time neither Mr. Gilmour nor myself were familiar with Patent Office law, and I was of the opinion at that time that the person who made the drawings and devised the machine, or, in other words, made it a mechanical device, was the inventor. I would like to qualify the word 'mechanical device' by saying I mean by that as a draftsman or mechanic would naturally put the idea of the other party on paper We talked over the matter on those lines, and he thought that probably or possibly

I might have been right, and therefore, to save trouble should any crop out later, concluded that was so; but, on talking the matter over with our patent solicitor, he explained that I was not right, and I therefore assigned orally to Mr. Gilmour what I was supposed to possess. The patent was then, by the advice of our patent solicitors, and I think rightly, taken out in the name of Mr. Gilmour. Q. And you say that he told you that he wanted to put two of those machines together, so that he could use them as one machine for planing a large stone—too large to be planed upon a single machine—and that you understood immediately just what he wanted the machine to do. Now, the question I want to ask you is, did he tell you how he wanted you to make those drawings in the details of the machine, or did he leave that all to your judgment as a mechanical engineer? A. As I have already stated. Mr. Gilmour brought the drawings of a single planer to me, and told me that he wanted the two machines put together, so that they could be worked together, and also said that it would be necessary, in having the two platens when used as a unit or a whole, to have them fixed together by some means, such as a key, or bolted, or some other means."

The positions and evidence of Young in this and the other suit are neither harmonious nor satisfactory. The fact is that neither was the first inventor. Brown or Thomson—one or both—anticipated Gilmour's alleged invention. Indeed, it is probable that Gilmour gained whatever conception he had from Brown, and Young studied out the details. Young testified:

"If I recollect aright, Mr. Gilmour came into the office, saying that he had seen a Mr. Brown, of Newark, and that Mr. Brown and he had been speaking of a double platen planer. Mr. Gilmour then said, 'We will have to get at that right away, or it will be too late,' giving me the impression that he had been thinking of the thing before; and I recollect, when I got out a patent for a radial planing machine, some time before—I don't know the date —Mr. Gilmour then told me that he had some other improvements that he wanted to put on or wanted to do with stone planers. That was all I recollect of either conversation. Q. Did Mr. Gilmour at that time state to you, in substance or fact, that he had been talking to a party called Brown, in Newark, who was in the stone business, and that party had asked him if it would not be a good thing to get up a double platen planer, and he (Gilmour) said: 'No; I told Brown this because I thought it was a good thing, and I will tell you we will go into the same thing upon the plan that we worked on the radial planer'? A. That statement is true, as far as I can recollect it."

Gilmour filed his application February 20, 1896. Brown filed his application March 5, 1896, but it does not appear in the record. On June 5, 1896, an interference was found between the two applications. Gilmour filed a preliminary statement that he conceived of the invention on or about March, 1895; "that on or about October, 1895, he first explained the invention to others; that early in January, 1896, a working drawing of the invention was commenced, using sketches previously made; that on or about the 1st day of February, 1896, the invention was reduced to practice by the completion of a full and complete working scale drawing of the machine."

Brown failed to file a preliminary statement, and judgment of priority of invention was rendered in favor of Gilmour on July 20, 1896. But on July 13, 1896, Brown relinquished all claim on the patent, in consideration of the payment of $60, and "the right to use the machine as patented by Gilmour, and built by A. G. Thomson for George Brown & Co." Brown was a witness for the defendant. He testified:

"Mr. Gilmour called at our office in Newark about in the early part of 1895—in the spring of 1895, to the best of my recollection. In the course of

the general conversation in relation to matters connected with stone-working machinery, I asked him his opinion as to the feasibility of making or building a planing machine which could be used as a double or a single machine. I took a piece of paper, made a rough sketch of the idea and showed it to him. Mr. Gilmour, after looking at the sketch, said that it was impracticable; that the idea was not worth a d——.

"I hand you a copy of the Gilmour patent, and ask you to look at the same, and state whether or not the machine there shown and described, in its general features, agrees with the invention which you described and illustrated by sketches to Mr. Gilmour during the conversation referred to in your last preceding answer? A. This is the same general idea spoken of to Mr. Gilmour. Q. Did you represent in the sketch any means for coupling the tables, or the driving mechanisms for the tables? A. I don't think I went into any details at all. Q. Had you in mind at that time any particular means for coupling the tables or the driving mechanism? A. At that time the drawings of this machine were well advanced, and, if I remember right, the patterns were even being made, so that I must have known about the details. Q. Please tell me what means you have for fixing the date—the spring of 1895—as the time of this conversation with Mr. Gilmour? A. I have no means except a conviction that it was about a year before the application of the patent."

He had earlier testified that it was in the latter part of the year 1894, to the best of his recollection, when he first thought of the double planer; that he talked with Mr. Thomson, a machinist in his employ; and that the latter made drawings pursuant to which a machine was commenced early in 1896, and finished in August of that year. The only portion of Brown's patent in evidence is claim 1, which reads:

"(1) The improved stone planing machine herein described, comprising a bed or frame having parallel ways and adjustable tool carriers, and tables arranged side by side on said ways, and operable either together, or movable independently, but simultaneously, whereby either one large stone carried by the two tables may be planed, or two stones, each on a table, may at the same time be planed independently on said tables, and means for operating said table, either separately or in unison, said parts being arranged and combined substantially as set forth."

This claim does not set forth either intention or means to unite the patents, but "means for operating said table, either separately or in unison," and might refer to a union of the gearing.

Thomson, Brown's draftsman, testified to conversations with Brown, and produced a drawing which he said was the outcome of such conversations. The witness calls it "but an outline." It does not show any means of locking or joining the platens. He also produced a second drawing. As to this he says:

"This is the second drawing I gave Mr. Brown, illustrating a different way of driving the machine by gearing, and also showing the way, or part of the way, that I intended to connect the two tables together, which was by means of a hole bored in each end ( the table, and a plug being inserted, and then clamped together by a bolt at each end of the table."

He states that it was completed about March, 1895. Referring to defendant's Exhibit Thomson Drawing, No. 3, he testified: "Q. What was the date of completion of this drawing No. 3? A. About December, 1895." This drawing, as to the connecting bolts, was followed in the construction of Brown's double platen, which was finished about July or August, 1896.

Beyond doubt, Gilmour got from Brown a conception of a double planer, whose platens could be operated separately or in combination.

Before that, Thomson had made a drawing showing the connection of the platens by bolts. Brown states that in his conversation with Gilmour he did not go into details. Therefore Gilmour employed Young to work out specific means for uniting the platens, and, as a result, Young devised the keys. The keys were not Brown's or Thomson's, but the bolts were Thomson's, and his drawing plainly shows that. The defendant used bolts, and therefore carried out Brown's general conception, and, in addition, provided a definite means for uniting the platens. Dayton, defendant's expert, testifies:

"In Figs. 1 and 2 [Thomson drawings], the sections A and A' of the platen are indicated as having at their ends, and adjacent to their meeting edges, perforated lugs through which horizontal bolts may be passed to lock the two sections of the table or platen together. These lugs I find to be already marked by red arrows. The Thomson drawing No. 3 also bears three figures, which I have numbered, in blue, 1, 2, and 3. In this drawing the driving gear, or rather the two independent driving gears, for the separate sections of the duplex table or platen, correspond in general with the drawing No. 1, and is more fully elaborated. It contains a sliding clutch for uniting the two driving gears, situated at a point which I have marked with an X in drawing No. 1; said drawing No. 3 having shaft and hand lever for operation of said clutch. I have marked these several parts with their names. I find in Figs. 1 and 3 of the Thomson drawing No. 3 the same horizontally pierced coupling-lugs for bolting the table sections together that are marked with a red arrow in the Thomson drawing No. 2, but without any mark, and I have therefore applied to them a blue arrow. These coupling lugs are in these figures 1 and 3, drawn in ink. In Fig. 2 the same lugs are roughly indicated in pencil only."

It is difficult to escape the conclusion that Brown, or Brown and Thomson, anticipated Gilmour in the conception of a machine such as is described in claim 1 of the patent, and also in making provision for such means for uniting the platens as are used by the defendant. The very statement of Young himself as to his conversation with Gilmour in this regard, confirms the conclusion that Brown and Thomson—one or both—had worked out the conception before Gilmour effected anything. It is quite improbable that Gilmour either conceived the patent generally or in detail. The fact seems to be that Gilmour set himself to work to utilize Brown's general conception, and that Young invented no definite means for uniting the platens until after the Thomson drawing No. 2 had been made. Young testified as follows:

"Q. Please state when and how you first became familiar with the invention shown and described in that Gilmour patent? A. I became acquainted with that invention in January of the year that patent was applied for, or it may have been December of the year previous. I became acquainted with the invention by Mr. Gilmour coming to me and saying that he would like to get out a patent for a double platen planer, or words to that effect."

The patent was applied for February 20, 1896, and was issued January 12, 1897.

Defendant's references may now be examined:

British patent No. 1,584, of 1861, issued to Fletcher and Fuller. Defendant concedes in its brief that this patent does not show "means for joining and locking them [platens] together," as shown by Gilmour in claim 1, nor "means for joining the sections and holding them locked relatively to each other," as shown in claim 2, nor "tapering keys matching corresponding notches in the adjacent edges of the sec-

tions for locking the latter together," as shown in claim 3.   The provisional specifications states:

"When the planing machine is required for planing very large articles, the tables are driven simultaneously, thus answering the purpose of one solid or entire table; but, when smaller articles of different sizes are to be operated upon, the tables can be driven independently of each other."

The specification states:

"The nature of our invention of improvements in machinery for planing consists in rendering such machines available for being used to plane two or more articles of different dimensions and shapes at the same time.   In order to accomplish this, we make the bed with the required number of guides or grooves for two or more tables, each of which is furnished with a toolholder and an independent starting, driving, and stopping apparatus."

Thereafter the specific means for "giving motion to each table independently of the other" are described, and later it is said:

"In planing very large castings the tables, b and b¹, act simultaneously, the shafts, g¹, being coupled at g⁵, as shown in dotted lines in figure 2, but at other times the shafts, g¹, are disconnected, and each table can then be traversed the required distance, irrespective of the other, as the strap fork of each driving apparatus is acted upon by an adjustable stud or reversing stop fixed to the table, as in ordinary planing machines, where a single table is employed."

In Knight's Mechanical Dictionary, vol. 2, p. 1730, it is said:

"Fletcher's duplex planing machine (English) is arranged with double beds and double tables, each table having a separate set of gearing, with starting, stopping, and feed motion.   There are two tool boxes on the cross-slide, each of which is independently self-acting, so as to work with its own table.   Thus the two tables may be used separately as two smaller machines working independently of each other, and capable of planing different lengths of work at the same time, or, when planing a large article, the two tables, gearing and motion, may be coupled so as to form one large machine—an arrangement rendering the machine capable of doing a variety of work.   *   *   *   Also one table may be fixed stationary as a bedplate to bolt awkwardly shaped or long pieces of work upon while they are planed by a slide rest fixed upon the other table.   When used as one machine, both sets of straps and gearing are in operation, and are reversed by the stops of one table only, so as to insure the straps moving at the same time."

Presumptively this article refers to an English machine related to Fletcher.   If there is any other machine than that of Fletcher and Fuller falling within the description, viz., "Fletcher's duplex planing machine (English)," whose is it?   In the absence of answer to this inquiry, the Fletcher and Fuller patent must be deemed described.   The article does state:

"The two tables, gearing and motion, may be coupled, so as to form one large machine.   *   *   *   When used as one machine, both sets of straps and gearing are in operation, and are reversed by the stops of one table only, so as to insure the straps moving at the same time."

There is not a suggestion of means for uniting the tables, except through straps and gearing.   No one could learn from this language that there were means for uniting the tables themselves, and how it could be done; and, if one interested went back to the patent, which was the subject of the description, he could find no suggestion of coupling tables.   On the other hand, he would find a mere coupling of the gearing.

131 F.—55

It is not deemed necessary to discuss the other references, for they have no bearing on the patent in suit, except to emphasize that it is an advance in the art.

It is considered that Gilmour's letters show something new and useful, except as anticipated by Brown or Thomson, or both. If Gilmour is entitled to the patent, the defendant infringes. Defendant uses tapering bolts at the extremities of the platens, which lock the platen sections in alignment crosswise. These bolts tend to hold the platens in such relation as to prevent longitudinal motion by one that is not shared by the other. They assure coincident reciprocation. Lateral approach or departure of the platens was not the vice to be remedied. There could be no mischief in that regard, for each platen is held in place by underlying and fixed guideways, on which it runs, and there could be no lateral motion of either platen. Such were the means employed before the Gilmour patent. But the difficulty was that the platens did not reciprocate contemporaneously. They did not keep step one with the other. This needed remedy. Fletcher and Fuller sought prevention by means of uniting the gearing, so that a unitary gearing would apply and maintain such application of moving power that one platen would reciprocate in correspondence with the other. Therefore the needed improvement was the direct coupling of the platens, so that they would reciprocate together and correct any lack of correspondence in motion. Gilmour's patent aims to employ two means—one old and one new. The old means was by connecting the gearing so as to make a unitary whole. The new means was by connecting the platens immediately so that they would move together like one platen. Each means assists the other. It aims to combine the driving power and to combine the platens to be driven. But there is another essential always present. The means must allow the platens to be reciprocated separately or in unison. The defendant's machine provides for this. It combines power and platens. The only question is whether Gilmour limited his claims for means of connecting the platens, so that the defendant's means of connecting the platens are not included in the claims. The defendant urges that its tapering bolts lock the platens together, but do not join them together. The defendant's position is understood to be that Gilmour's claims (1 and 2) provide for means that "draw the tables into close contact," and at the same time keep them locked in such juxtaposition, while defendant's means do not bring their opposing sides into physical contact, nor tend so to do, but leave each platen in its former physical relation to the other, and shackle them for the purpose of reciprocation. It has been noted that the platens cannot be drawn into physical contact, because they are carried on "two sets of parallel ways," and are intended to operate "separately or in unison"; nor is there the slightest evidence of intention to cause them to approach each other laterally when unitary action is required, nor to recede laterally from each other when separate operation is desired. Such discussion may be laid aside at once.

The only other contention is that, by "joining the sections," Gilmour's claim intends that the connecting means become an integral part of each platen, so as to unite both in one whole, as a bridge joins the shores of an intervening stream. But the specification states:

"Other forms of keys may be substituted for those shown, correspondingly altering the shape of the notches, or other fastenings, as sliding bolts, may be employed."

This shows that the words "joining the sections and locking them" (claim 1) and "joining the sections and holding them locked" (claim 2), refer to means that connect the platens, and hold them locked in such connection. The defendant's device does this, and falls within the claims.

The third claim calls for "tapering keys matching to corresponding notches in the adjacent edges of the sections." The defendant's expert describes the defendant's means of connecting the platens as follows:

"The tables or table sections do not touch each other, but are separated by a substantial space, as indicated by the double line in the lowermost figure of the blue print. At each end of each table section is formed a transverse trough open at the top and closed at its ends and sides, as best indicated in the drawing Defendants' Exhibit Defendants' Platen Connection. Through the adjacent inner end walls of these troughs, marked $D^7$, $D^7$, in Fig. A of Defendants' Exhibit Defendants' Platen Connection pass the tapered bolts, $D^8$, having on their smaller ends the nuts, $D^9$; said bolts being fitted to correspondingly tapered holes in the walls, $D^7$, $D^7$. These bolts do not tend to draw the table sections towards each other, or into junction along their adjacent edges, but the nuts on said bolts merely draw the bolts severally into close fit with the different sized tapered holes through which they severally pass. There is nothing in the bolt, $D^8$, to prevent the right-hand table, B, from moving inward further towards or into contact with the left-hand table, or to prevent the left-hand table from moving to the right towards or against the right-hand table. And there is nothing in the machine to prevent an inward lateral movement of either table. Each table is, however, held against outward movement by the vertical surface, $A^2$, formed on the lower part of the V-shaped slide which runs in the fixed way, $A'$, of the bed; and therefore the bolt, $D^8$, or both said bolts are not called upon to perform any function whatever in holding the table, or either of the tables, against lateral displacement. Either table may be laterally displaced inwardly, notwithstanding the bolts, or without prevention from either the bolts or the shoulders, $A^2$, on the slides."

The troughs are continuations of the platens, and their "adjacent inner end walls" carry bolts. If the bolts passed into "corresponding notches in the adjacent edges of the sections," they would fall within claim 3. Does the fact that the side pieces, vertical to the bed of the platens, are provided to carry the bolts, take defendant's device out of the claim? It seems that claim 3 was intended to provide an exact and peculiar manner for fastening the platens, and defendant's bolts, while effecting the same result, do it in a different way from that very definitely described in claim 3. Therefore it is concluded that defendant's device falls within claims 1 and 2, but does not fall within claim 3.

The discussion of infringement has been upon the assumption that Gilmour was the inventor. But it has been earlier concluded that Thomson's drawing No. 2 shows the patent, except as to the peculiar means of connection shown in claim 3, which defendant does not infringe.

The defendant should have a decree dismissing the bill, with costs.